**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>CRISTÓBAL M. GALINDO, P.C. D/B/A GALINDO LAW FIRM,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-90764 (ARP) |
| CMG FUNDING 2025 LLC,<br><br>Plaintiff,<br><br>-against-<br><br>CRISTÓBAL M. GALINDO, P.C. D/B/A GALINDO LAW FIRM, and GALINDO & MOTT, LLP,<br><br>Defendants. | Adv. Pro. ____________ |

**ADVERSARY COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

[1] The Debtor's address is 18000 Groeschke Road, Suite A-7, Houston, Texas 77084, and the last four digits of the Debtor's federal tax identification number is 5859.

CMG Funding 2025 LLC ("CMG" or "Plaintiff"), by its undersigned counsel, as and for its complaint (the "Complaint") against the above-captioned debtor Cristóbal M. Galindo, P.C. d/b/a Galindo Law Firm ("Debtor") and Galindo & Mott, LLP ("GM LLP" and together with the Debtor, the "Defendants" or the "Borrowers"), hereby alleges, upon knowledge as to its own actions and status, and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT[2]

1. CMG seeks a declaratory judgment of its security interests and an order enjoining the use of CMG's collateral unless CMG consents to the use of its collateral or is otherwise adequately protected as required by Section 363(e) of the Bankruptcy Code. The Debtor and Defendants have settled on a scheme whose primary focus appears to be to avoid and repudiate the binding pre-petition agreements reached with CMG pursuant to which the Debtor and Defendants agreed to borrow $45 million from CMG and secure such amounts by valid pledges over all of their assets. In filing the underlying Chapter 11 Case, Debtor inexplicably scheduled CMG as an unsecured creditor even though CMG is Debtor's largest secured creditor and Debtor treated it as such until recently when it openly violated the terms of the binding loan documents and representations it made in connection therewith, including representations made by the Debtor and its principal (a practicing attorney) as to the validity of the security grant and its ability to provide it, as well as the execution of a security agreement as part of an arm's length financing transaction. Section 363 of the Bankruptcy Code explicitly protects CMG from the disposition of its collateral; and CMG asks this Court to enforce those protections and the security agreement at issue.

[2] Capitalized terms not defined in this Preliminary Statement have the meanings ascribed to them in the remainder of the Complaint.

2. Debtor has previously utilized secured financing for its law practice. In early 2024, Debtor engaged a broker, who introduced Debtor to JBSL Legal Finance LLC ("JBSL") in an effort to get JBSL to arrange secured financing for the Borrowers. In May 2024, GM LLP, Debtor—who had recently entered into a complex transaction repaying a previous lender, and non-party CMG Funding 2024 LLC entered into an initial $25,000,000 credit facility. Less than a year later and after extensive marketing spend by the Borrowers, they sought to refinance their existing secured debt with CMG Funding 2024 LLC by obtaining additional secured financing from Plaintiff CMG Funding 2025 LLC. The result was that Debtor—a sophisticated law firm—and GM LLP executed a credit agreement and security agreement, among other loan documents (the "Credit Documents") with CMG and obtained $45 million in secured financing.

3. As is customary in secured lending transactions, CMG filed a UCC-1 Financing Statement, which was acknowledged by the office of the Texas Secretary of State on February 27, 2025, and the Borrowers and CMG entered into (x) the Security Agreement pursuant to which all of Debtor's assets were pledged as collateral to secure the loan and thereafter (y) a Blocked Account Control Agreement pursuant to which CMG was granted control over the account identified in the Cash Management Motion as the "Deer Finance Account" (the "Controlled Account") within the meaning of Section 9-104 of the UCC (the "Blocked Account Control Agreement"). CMG thereafter advanced approximately $45 million to the Borrowers. Through the various agreements, CMG holds a valid, perfected and first-priority security interest and lien in the Collateral under the Credit Documents, which includes essentially all assets and receivables of the Borrowers, including the Debtor.

4. Remarkably, despite the voluntary entry by Debtor into the Credit Documents and the pledging of its assets in exchange for the financing it received, Debtor listed CMG on Official Form 204 (the top unsecured creditor list), which accompanies its Petition, as its largest unsecured creditor. Form 204 was executed by Cristobal Galindo under penalty of perjury. Mr. Galindo is the same party who executed the Credit Documents on behalf of the Debtor.

5. The incomprehensible designation of CMG as an unsecured creditor follows a state-court action where insiders and affiliates of Debtor (including Sergio de la Canal and entities controlled by him, as discussed in further detail below) engaged in a coordinated litigation scheme in order to dissipate Collateral and evade the carefully constructed and agreed-to cash-control system under the Credit Documents through a garnishment order for the benefit of such insiders and affiliates. CMG was not notified of and did not become aware of the garnishment order until after Collateral had already been transferred to Mr. de la Canal's affiliated entities, purportedly pursuant to the garnishment order. When CMG demanded that Mr. de la Canal and his affiliated entities turnover the Collateral that was transferred to his affiliated entities, one of Mr. de la Canal's affiliated entities commenced an action in the 127th Judicial District Court of Harris County, seeking declaratory relief against CMG and Debtor. In July 2026, CMG timely removed the declaratory action to the Texas Business Court and brought claims against Mr. de la Canal's affiliated entities and the law firm that transferred the purportedly garnished Collateral to reclaim CMG's Collateral. This Chapter 11 Case has the hallmarks of an abuse of the bankruptcy process engineered by the Debtor's principal, Cristóbal M. Galindo, and insider Sergio de la Canal to further the scheme of diverting CMG's Collateral to Mr. de la Canal. CMG files this action to put a stop to that improper scheme and protect its Collateral, including cash collateral.

6. CMG thus asks this Court for relief on three claims: *First*, a declaration that CMG holds a valid, perfected and first-priority security interest and lien in the Collateral pursuant to the 2025 Credit Agreement (as defined below) and other Credit Documents, and that the Collateral includes all pledged assets and receivables of the Debtor as specified in the Credit Documents. *Second*, that Section 363(c)(4) requires Debtor to "segregate and account for any cash collateral" that belongs to CMG. *Third*, injunctive relief, including a temporary restraining order, prohibiting Debtor from using CMG's Collateral of any kind (including all cash collateral) absent the consent of CMG or Court-ordered adequate protection, as provided for in the Bankruptcy Code.

**JURISDICTION AND VENUE**

7. This adversary proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to (i) determine the validity, priority, or extent of a lien or other interest in property, (ii) obtain a declaratory judgment relating to the foregoing, and (iii) provide injunctive relief. Fed. R. Bankr. P. 7001(b), (g), (i).

8. This Court has jurisdiction over this action under 28 U.S.C. § 1334. This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The statutory predicates for the relief requested herein are sections 105, 363, and 506 of Title 11 of the United States Code (the "Bankruptcy Code"), section 2201 of Title 28 of the United States Code, and Rules 7001 and 7065 of the Bankruptcy Rules.

10. Pursuant to Bankruptcy Rule 7008 and Bankruptcy Local Rule 7008-1, CMG consents to entry of final orders or judgment by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## THE PARTIES

11. Defendant Cristóbal M. Galindo, P.C. d/b/a Galindo Law Firm[3] is a professional corporation organized under the laws of the State of Texas, with its principal place of business in Houston, Texas.

12. Defendant Galindo & Mott, LLP is limited liability partnership organized under the laws of the State of Texas, with its principal place of business in Houston, Texas, in which Debtor owns a 60% partnership interest.

13. Plaintiff CMG Funding 2025 LLC is a limited liability company organized under the laws of State of Delaware and the lender and administrative agent under the 2025 Credit Agreement (as defined below).

## STATEMENT OF FACTS

### A. The Chapter 11 Case

14. On August 24, 2026 (the "Petition Date"), the Debtor commenced the chapter 11 case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. The Debtor is operating and managing its business as a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in the Chapter 11 Case.

### B. The Cash Collateral Motion

15. On August 25, 2026, the Debtor filed an *Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral, to the Extent Applicable, and Granting Related Relief* (the "Cash Collateral Motion") [ECF No. 13], admitting that "CMG

[3] The Debtor has also used other dba names in the past, including Law Office of Cristobal M. Galindo, Galindo Law, Galindo Law Trial Attorneys, Galindo Law Firm, Law Office of Cristobal M. Galindo, P.C. *See* Petition at 1 [ECF No. 1].

Funding 2024 LLC, [and CMG]," and other entities may be determined to hold an interest in Cash Collateral, and even referring to the foregoing entities, including CMG, as "the Prepetition Secured Parties." Cash Collateral Mot. ¶ 5.

16. Despite Debtor's mischaracterization of CMG's secured claim on Official Form 204 (the top unsecured creditor list), the Cash Collateral Motion seeks an order finding that "incoming postpetition cash . . . is not Cash Collateral and is not subject so any ***secured position*** of the Prepetition Secured Parties[,]"[4] and granting "adequate protection to Prepetition Secured parties[.]"[5]

17. The Debtor further admits in its Summary of Material Terms of the proposed interim order that "CMG Funding 2024 LLC, [and CMG]," among others, may hold an interest in Cash Collateral and proposed adequate protection to be provided to secured creditors. *Id.* ¶ 13; *see also id.* ¶¶ 49-52 (describing Debtor's proposed adequate protection and asserting that "the Prepetition Secured Parties are adequately protected" under the proposed interim order).

18. Although Debtor fails to mention any Credit Documents other than the 2024 Facility and 2025 Credit Agreement in its motion—brazenly identifying a "DACA-related account"[6] without addressing the circumstances under which a security interest in such an account would be granted to CMG—it admits that the 2025 Facility required "compliance with covenants,"[7] as discussed further below, and, at most, Debtor "disputes . . . ***certain*** asserted liens and claims"[8] and claims it will "challeng[e] alleged security interests[,]"[9] notwithstanding

---

4 *Id.* ¶ 9.b (emphasis added).

5 *Id.* ¶ 9.e.

6 *Id.* ¶ 28. *See also id.* ¶ 30.

7 *Id.* ¶ 20.

8 *Id.* ¶ 22 (emphasis added).

9 *Id.* ¶ 36.

Debtor's scheduling of CMG's claim as entirely unsecured.

19. Debtor even admits (incorrectly) that "***CMG's . . . lien***" is severed under section 552(a) of the Bankruptcy Code (it is not). Cash Collateral Mot. ¶ 57 (emphasis added); *see also id.* ¶ 60 (arguing that "552(a) cuts off ***CMG's lien*** completely.") (emphasis added).

20. Finally, Debtor shockingly admits that, despite Debtor's execution of the Credit Documents discussed herein, including acknowledgments, representations, warranties, and covenants, certifications signed by Mr. Galindo, as well as public UCC-1 Financing Statements in favor of CMG, "it disputes that any lien" of CMG relating to "client funds, unearned fees, or future recoveries" is valid and enforceable before this Court. *Id.* ¶ 65.[10]

**C. The Borrowers and the CMG Term Loan Facility**

21. The Debtor operates as primarily a plaintiff law firm specializing in pursuing personal injury, insurance, and mass torts cases on behalf of individual clients. The Debtor estimates that it has represented approximately 22,000 individual clients in connection with various legal matters, including personal injury matters.

22. In or around March or April 2024, a commercial lending broker, Rita Reynolds (the "Broker"), contacted JBSL Legal Finance LLP, inquiring if JBSL might be interested in extending financing to Debtor and Defendant GM LLP. The Broker had explained that Debtor was a plaintiff law firm that was looking to expand its practice and raise capital. Upon information and belief, Borrowers had utilized secured financing structures in the past to fund their law practice and had recently completed a complex transaction—exceeding $50,000,000—under which the Debtor assigned fee receivables to a previous lender as a settlement of the unpaid

[10] Debtor concedes that its Cash Collateral Motion, which generally lacks citations or references to a declaration or other admissible fact evidence, is not the correct "procedural vehicle" for its baseless position as to CMG's security interest and lien. *Id.* ¶ 65.

amounts due to that previous lender.

23. Ultimately on May 9, 2024, Debtor and GM LLP entered into a $25,000,000 secured credit facility (the "2024 Facility") with non-party CMG Funding 2024 LLC. *See Debtors Emergency Mot. for Entry of Interim and Final Orders Authorizing Use of Cash Collateral, to the Extent Applicable, and Granting Related Relief* (hereafter the "Cash Collateral Motion") ¶ 18 [ECF No. 13].

24. The Borrowers promptly exhausted close to all availability under the 2024 Facility, which led to JBSL, Debtor, GM LLP, the Debtor's principal, Mr. Cristobal M. Galindo, non-parties Decibel Legal Services LLC and Decibel, LLC (collectively, "Decibel"), and Decibel's principal, Mr. Sergio de la Canal,[11] negotiating a refinancing and new credit agreement for the Borrowers.

25. On February 26, 2025, the Debtor and GM LLP entered into that certain *Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "2025 Credit Agreement" or the "2025 Facility") with CMG as lender and as administrative agent. *See* **Exhibit A** (2025 Credit Agreement).

26. CMG is a special purpose vehicle specifically formed to be the lender under the 2025 Credit Agreement. CMG is ultimately managed (through another limited liability company) by Mr. Ayal Glezer. Mr. Glezer is also the Chief Executive Officer of Deer Finance LLC ("Deer"), the servicer for the 2025 Facility (the "Servicer"). Deer is a leading servicing and syndication platform for law firm loans. In addition, JBSL was an arranger for, and is an investor

---

[11] Indeed, given the integrated nature of Mr. de la Canal's various entities with the Debtor, Mr. de la Canal is specifically named in the 2025 Credit Agreement (as defined herein) as a potential "Key Person" and "Limited Guarantor" contingent upon a contemplated merger involving the Borrowers, Decibel, and a law firm owned by Mr. de la Canal named LevelUp Law, LLC ("LevelUp"). Upon completion of the contemplated merger, which was not consummated, Mr. de la Canal would have become a "Key Person" and a "Limited Guarantor" under the 2025 Credit Agreement

in, the 2025 Facility. The team at JBSL has been structuring and syndicating loans to law firms for the past nine years (including through a prior platform at the investment bank Stifel).

27. Under the 2025 Credit Agreement, CMG agreed to extend a senior secured term loan facility to the Borrowers.

28. As of the date hereof, the unpaid principal balance on the 2025 Facility, inclusive of capitalized interest (including capitalized default interest) is approximately $49,519,167, plus accrued interest (including default interest) of approximately $1,771,686.

29. In connection with the 2025 Credit Agreement, the Borrowers executed that certain *Security Agreement* with CMG, also dated February 26, 2025 (the "Security Agreement"). *See* **Exhibit B** (Security Agreement).

30. Under the Security Agreement, the Borrowers granted a "lien on and continuing security interest in, all of the property of the [Borrowers] wherever located and whether now or hereafter existing, whether now owned or hereafter acquired, whether tangible or intangible, of every kind and description." Ex. B at 3.

31. Pursuant to the Security Agreement, CMG's Collateral explicitly includes, among other things, "all fees, reimbursed expenses and other amounts payable to the" Borrowers, including any fees or consideration owed to the Borrowers. *Id.*

32. On April 18, 2025, to further secure the Borrowers' obligations under the 2025 Facility, the Debtor, CMG, and JPMorgan Chase Bank, N.A. entered into that certain *Blocked Account Control Agreement – Secured Party Control*. *See* **Exhibit C** (BACA).

33. In connection with the 2025 Facility and to induce CMG to enter into the transactions contemplated under the 2025 Credit Agreement, Mr. Cristobal M. Galindo, in his individual capacity, entered into that certain *Limited Guaranty* dated February 26, 2025. *See*

**Exhibit D** (Limited Guaranty).

34. On February 26, 2025, the Borrowers and CMG also entered into that certain *Account Administration Agreement*, which provides that CMG is irrevocably appointed to provide certain services with respect to the Borrowers' bank accounts. *See* **Exhibit E** (Account Administration Agreement).

35. Accordingly, the Borrowers' obligations under the 2025 Facility are (i) secured by a first-priority lien on the Collateral, including all assets of the Borrowers, pursuant to a security agreement and deposit account control agreements executed in connection with the 2025 Facility, and (ii) guaranteed by Mr. Cristobal M. Galindo, in his individual capacity.

36. The obligations of the Borrowers under the 2025 Facility are further evidenced by a separate promissory *Note* executed in favor of CMG and governed by the 2025 Credit Agreement. *See* **Exhibit F** (Promissory Note).

37. In the Security Agreement, the Borrowers further represented and warranted to CMG that (i) all "financing statements, agreements, instruments and other documents necessary to perfect the security interest granted by [the Borrowers] to [CMG] in respect of the Collateral have been delivered . . . in completed and, to the extent necessary, duly executed form for filing[,]"[12] and the Borrowers "ha[ve] the lawful power and authority to execute this [Security] Agreement and to grant the pledge, security interest and lien in its rights in the Collateral to [CMG] and consummate the transactions contemplated hereby."[13]

38. In furtherance thereof, on February 26, 2025, Mr. Galindo certified in that certain *Closing Date Certificate*, delivered pursuant to the 2025 Credit Agreement, that he is the

---

[12] Ex. B § 5.(b).

[13] *Id.* § 5.(c).

President of the Debtor and the Managing Partner of GM LLP; he "reviewed the terms of the Credit Documents," and he "made, or ha[d] caused to be made under [his] supervision, such examination or investigation as is necessary to enable [him] to express an informed opinion as to the matters referred to [t]herein[;]" and based upon that review, "on behalf of the [Debtor] and [GM LLP] and not in any individual capacity," the "representations and warranties contained in each of the Credit Documents . . . are true and correct in all material respects[.]" *See* **Exhibit G** (Closing Date Certificate).

39. The Borrowers further agreed that until all of their obligations under the 2025 Facility are paid in full in cash, the Borrowers shall maintain "a current record of the location of all Collateral and permit from time to time [CMG] . . . to inspect . . . such records . . . pursuant to Section 5.11 of the Credit Agreement[,]"[14] and the Borrowers irrevocably authorized CMG to file in any relevant jurisdiction any financing statements and amendments thereto relating to the Collateral.[15] In addition, the Borrowers covenanted to maintain CMG's security interest in the Collateral "as a perfected first priority security interest, . . . [and] not do or permit any act which would impair any material portion of the Collateral[.]" Ex. B § 6.(b).

40. Debtor would, from time to time, provide CMG a "Collateral Update Memo" expressly "Prepared For: Deer Finance, as Collateral Agent and Servicer[.]"[16]

41. Debtor also provide CMG a "Collateral Details Report" as recently as April 7, 2026, which identifies cases that are part of CMG's Collateral as well as related costs and expenses.[17]

---

14 *Id.* § 6.(a).

15 *Id.* § 7.

16 *See* **Exhibit J** (Oct. 30, 2025 Collateral Update Memo).

17 *See* **Exhibit K** (April 7, 2026 Collateral Details Report).

42. The 2025 Credit Agreement includes numerous conditions precedent to the Initial Advance to be made at Closing thereunder "in order to create in favor of [CMG] . . . a valid, perfected first priority Lien in the Collateral[.]" Ex. A § 3.1(e).

43. On February 27, 2025—the day after CMG and the Borrowers executed the 2025 Credit Agreement and Security Agreement, among other transaction documents—CMG perfected its security interest in the Debtor's and GM LLP's assets through the public filing of a UCC-1 financing statement with the Texas Secretary of State (the "CMG Financing Statement"). *See* **Exhibit H** (CMG Financing Statement).

44. Upon filing the CMG Financing Statement, the Texas Secretary of State acknowledged that it indexed in its records the security interest listing each of the Debtor and GM LLP as a debtor and CMG as the secured party. *See* **Exhibit I** (Acknowledgment of Texas Secretary of State, attaching CMG Financing Statement).

45. In addition to specifically identifying each of the Debtor and GM LLP as a debtor and CMG as the secured party, the CMG Financing Statement also describes CMG's collateral and identifies the 2025 Credit Agreement as the governing document from which certain capitalized terms are utilized in the CMG Financing Statement. Ex. G at 1-5.

46. The CMG Financing Statement publicly filed with the Texas Secretary of State provides that the Borrowers granted to CMG "a lien on and continuing security interest in, ***all of the property of [the Borrowers], wherever located and whether now or hereafter existing, whether now owned or hereafter acquired, whether tangible or intangible, of every kind and description***," including, without limitation, certain enumerated categories of property. *Id.* at 3 (emphasis added).

47. In addition, pursuant to section 5.1 of the 2025 Credit Agreement, the

Borrowers periodically delivered a Borrowing Base Certificate to CMG, along with a Narrative Quarterly Report regarding CMG's Collateral, including the Cases, the Borrowers' Client Portfolio, any Collections received, and the amount of any Co-Counsel Fees payable to the Borrowers, among other Collateral. *See* Ex. A §§ 5.1(a)(i) and (a)(ii). *See also* **Exhibit L** (Certified Borrowing Base excel file dated January 10, 2026).

48. The Borrowing Base Certificates, Collateral Memos, and Collateral Reports Debtor provided to CMG indicated that Debtor was maintaining CMG's valid first-priority security interest in the Debtor's assets.

49. Accordingly, there can be no dispute that CMG holds a first-priority, perfected security interest in all of the Borrowers' assets, including all of the Debtor's assets, and including their accounts, accounts receivable, and any funds owed to the Debtor.

**D. The Borrowers' Operations, Messrs. Galindo and de la Canal, and Affiliated Entities**

50. Upon information and belief, Mr. de la Canal and entities he owns or controls, directly or indirectly, have had a relationship with Mr. Galindo and the Debtor that predates Decibel's and Mr. de la Canal's involvement in the negotiation and diligence discussions that led to the execution of the 2025 Credit Agreement (and Mr. de la Canal's identification as a putative party to the 2025 Credit Agreement).

51. Upon information and belief, and as reflected in the 2025 Credit Agreement, the Debtor and Mr. de la Canal, and/or entities he owns or controls, previously contemplated a merger in connection with the 2025 Credit Agreement.

52. Upon information and belief, until recently, Decibel regularly identified potential clients for the Debtor and provided pre-screening, intake, and administrative services on its behalf.

53. Upon information and belief, Decibel's client identification and intake

services for the Debtor are documented in at least four separate master service agreements between the Debtor and Decibel or other entities owned or controlled by Mr. de la Canal.

54. Upon information and belief, in each of the four master service agreements, Decibel explicitly acknowledges that the Debtor may grant a security interest in any or all of [its] rights under the service agreement and Decibel consents to any such grant.

55. Upon information and belief, Mr. de la Canal's involvement with the Borrowers, in his individual capacity as well as through entities he controls and/or owns directly or indirectly, extends beyond Decibel.

56. Upon information and belief, Mr. de la Canal, through his companies Damage Reports LLC and Damage Resources, LLC (collectively, "Damage Resources"), serves as the Debtor's professional employer organization (a "PEO") handling the Debtor's payroll and human resource-related needs.

57. Upon information and belief, under the PEO arrangement, Mr. de la Canal through Damage Resources is a co-employer of the Debtor's employees.

58. Upon information and belief, Mr. de la Canal is the legal and/or equitable owner, directly or indirectly, and/or exercises control over Decibel Advertising, LLC, Pajaro Uno LLC, Damage Resources, Alpha Seven LLC, and Twin Diamond LLC, among others, and each entity is listed on the Debtor's top unsecured creditor list on Form 204 accompanying its chapter 11 petition.

59. Mr. de la Canal and his entities apparently provide the office space, use of private planes, employees, source of clients, and back-office support for Debtor. Based on the foregoing and other facts that will be developed, Mr. de la Canal and at least some, if not all, of his various entities are clearly insiders of the Debtor. He and his entities are, however, unsecured

creditors.

**E. The Debtor's Petition**

60. Notwithstanding the Credit Documents, the Debtor's, GM LLP's and Mr. Cristóbal M. Galindo's previous acknowledgments that CMG's debt was secured, and the public UCC-1 Financing Statement filed by CMG and acknowledged by the office of the Texas Secretary of State, the Debtor's Official Form 204 annexed to its petition classifies CMG as an ***unsecured*** creditor.

61. Notably, numerous entities affiliated with Mr. de la Canal are identified among the remaining purported creditors with the largest claims against the Debtor, including but not limited to Decibel Advertising, LLC, Mr. de la Canal, in his individual capacity, Pajaro Uno LLC, Damage Resources, LLC, Alpha Seven LLC, and Twin Diamond LLC. As described more fully in CMG's other filings, Mr. de la Canal, Debtor and others worked together to evade CMG's secured interests and the protection of the controlled account. Utilizing a litigation where CMG had no notice or involvement, Debtor, Mr. de la Canal and others secured a garnishment order that they used to transfer at least $6,548,429.72 in CMG's Collateral to Mr. de la Canal's affiliated entities—$4,748,429.72 on March 27, 2026 and $1,800,000.00 on June 12, 2026.[18] This bankruptcy appears to be another step in their plan to use litigation to benefit insiders at CMG's expense.

---

18 *See, e.g.,* **Exhibits M** (Final Judgment, entered March 23, 2026 (Cause No. 2024-89003B, 157th Judicial District Court, Harris County)), **N** (Decibel's Original Petition for Declaratory Relief, with Exhibits A and B, filed June 17, 2026 (Cause No. 2026-40981, 127th Judicial District Court, Harris County)), **O** (CMG's Notice of Removal to the Texas Business Court, filed July 2, 2026 (Cause No. 26-BC11A-0073)), **P** (CMG's Answer/Counterclaim/Third-Party Petition, filed July 12, 2026 (Cause No. 26-BC11A-0073)), **Q** (Decibel's Motion to Remand, filed July 31, 2026 (Cause No. 26-BC11A-0073)), and **R** (Krause & Kinsman's Plea to the Jurisdiction, filed August 7, 2026 (Cause No. 26-BC11A-0073)).

## CAUSES OF ACTION[19]

### COUNT 1
### (Against All Defendants)
### Declaratory Judgment as to the Validity, Amount, Priority and Extent of CMG Claim

62. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

63. Pursuant to the 2025 Facility, CMG was granted first-priority security interests in the Collateral.

64. In return for those first-priority security interests in the Collateral, CMG advanced approximately $45 million to the Borrowers, which was used to refinance existing secured indebtedness and, upon information and belief, was also used by the Borrowers to operate their law firms and to pay related costs and expenses.

65. CMG advanced the funds to the Borrowers in reliance upon, among other things, (i) the provision of the first-priority security interests in the Collateral and (ii) the Borrowers' representations and warranties under the Credit Documents.

66. CMG publicly filed all necessary UCC-1 Financing Statements to perfect its security interests in the Collateral, and those Financing Statements have not lapsed, nor been terminated or otherwise amended.

67. All assets of the Debtor, tangible and intangible, including cash and accounts, was made subject to CMG's valid, perfected and first-priority security interest, and remains subject to CMG's valid, perfected and first-priority security interest and lien.

---

[19] CMG expressly reserves all rights to seek leave to amend this Complaint to add claims or causes of action that may become known to Plaintiff at any time during this adversary proceeding, through formal discovery or otherwise, and for such amendments to relate back to the filing of this original Complaint. Alternatively, Plaintiff reserves the right to bring such claims in a separate action in an appropriate forum.

68. Pursuant to Rules 7001(b) and (i) of the Bankruptcy Rules and 28 U.S.C. § 2201, CMG seeks a declaratory judgment for purposes of determining and adjudicating questions of actual controversy between the parties, which questions and this adversary proceeding are within the Court's jurisdiction, and, thus, the Court may declare rights and other legal relations of the parties.

69. The dispute between the Plaintiff and Defendants is definite and concrete, including based upon Debtor's assertions in the Cash Collateral Motion, and a declaratory judgment is necessary and appropriate because there exists an actual case and controversy as to whether CMG has a perfected, first-priority security interest in the Collateral.

70. CMG asserts, and is informed and believes that the Debtor denies, that CMG holds a valid, perfected and first-priority security interest in the Collateral.

71. The dispute concerns legal interests espoused by the Plaintiff, on the one hand, and the Debtor, on the other hand, and a declaratory judgment will resolve the legal issues involved by finalizing the controversy and offering relief from uncertainty.

72. CMG is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 that CMG has a valid, perfected, first-priority lien and security interest in the Collateral.

**COUNT 2**
**(Against the Debtor)**
**Segregation of Proceeds of CMG Cash Collateral Under 11 U.S.C. §§ 105 and 363(c)(4)**

73. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

74. Section 105 of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

75. Section 363(c)(4) of the Bankruptcy Code provides that the Debtor "shall segregate and account for any cash collateral in [its] possession, custody, or control." 11 U.S.C. § 363(c)(4).

76. Section 363(a) of the Bankruptcy Code defines "cash collateral" broadly as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . whether existing before or after the commencement of a case under this title."

77. Accordingly, the Debtor shall segregate and account for all cash collateral in its possession, custody, or control to which CMG has an interest.

**COUNT 3**
**(Against the Debtor)**
**Injunctive Relief Under 11 U.S.C. §§ 105 and 363(c)(2)**

78. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

79. Section 105 of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

80. Section 363(a) of the Bankruptcy Code defines "cash collateral" broadly as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . whether existing before or after the commencement of a case under this title."

81. Section 363(c)(2) of the Bankruptcy Code provides that the Debtor "may not use, sell, or lease cash collateral . . . unless— (A) each entity that has an interest in such cash

collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

82. Pursuant to the 2025 Facility, CMG was granted first-priority security interests in the Collateral.

83. In return for those first-priority security interests in the Collateral, CMG advanced approximately $45 million to the Borrowers, which, upon information and belief, was used by the Borrowers to operate their plaintiff-side legal firms and to pay related costs and expenses.

84. CMG advanced the funds to the Borrowers in reliance upon, among other things, (i) the provision of the first-priority security interests in the Collateral and (ii) the Borrowers' representations and warranties under the Credit Documents.

85. CMG filed all necessary UCC-1 Financing Statements to perfect its security interests in the Collateral, and those Financing Statements have not lapsed, nor been terminated or otherwise amended.

86. All assets of the Debtor, tangible and intangible, including cash and accounts, was made subject to CMG's valid, perfected and first-priority security interest, and remains subject to CMG's valid, perfected and first-priority security interest and lien.

87. An injunction requiring the Debtor to comply with Section 363(c)(2) and conditioning the Debtor's use of CMG's cash collateral upon either CMG's consent or a finding by the Court that CMG's interest in the cash collateral is adequately protected is warranted pursuant to sections 105 and 363 of the Bankruptcy Code because, among other reasons, the Debtor proposes to use on an interim and final basis CMG's cash collateral without providing adequate protection, and, absent injunctive relief, the Debtor's administration of the estate will have an

immediate adverse consequence for CMG and be in violation of the Bankruptcy Code. Among other things, allowing the Debtor to ignore CMG's valid, perfected and first-priority security interest and lien in the Collateral, including cash collateral, would substantially harm CMG, including because its Collateral is its primary source of recovery on its secured claim.

88. Accordingly, CMG seeks a ruling, pursuant to sections 105 and 363 of the Bankruptcy Code, conditioning the Debtor's use of CMG's cash collateral on compliance with section 363(c)(2) of the Bankruptcy Code.

[*Remainder of Page Intentionally Left Blank*]

## **PRAYER FOR RELIEF**

Based on the foregoing, Plaintiff requests that the Court enter an order and judgment in its favor and against Defendants as follows:

(1) On Count 1 against all Defendants, a judgment declaring that CMG has a valid, perfected, first-priority security interest in the Collateral;

(2) On Count 2 against the Debtor, a judgment ordering, pursuant to sections 105 and 363(c)(4) of the Bankruptcy Code, the Debtor to segregate and account for all cash collateral in its possession, custody, or control to which CMG has an interest;

(3) On Count 3 against the Debtor, a judgment ordering, pursuant to sections 105 and 363(c)(2) of the Bankruptcy Code, the Debtor to comply with section 363(c)(2) of the Bankruptcy Code and enjoining the Debtor from using CMG's cash collateral absent satisfaction of the requirements of the Bankruptcy Code;

(4) Costs in bringing this action under Bankruptcy Rule 7054 and the Note and 2025 Credit Agreement; and

(5) Such other and further relief as the Court may deem just and proper.

Dated: August 26, 2026
Houston, Texas

Respectfully submitted,

*/s/ Craig Stanfield*

Craig Stanfield (TX Bar No. 24051371)
**PAUL HASTINGS LLP**
609 Main Street, Suite 2500
Houston, TX 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-0111
Email: craigstanfield@paulhastings.com

-and-

Kristopher M. Hansen (*pro hac vice* pending)
Jon Canfield (*pro hac vice* pending)
Daniel Ginsberg (*pro hac vice* pending)
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Emails: krishansen@paulhastings.com
joncanfield@paulhastings.com
danielginsberg@paulhastings.com

-and-

Adam Harris (*pro hac vice* pending)
Reuben E. Dizengoff (*pro hac vice* pending)
**MCDERMOTT WILL & SCHULTE LLP**
919 Third Avenue
New York, NY 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955
Emails: acharris@mcdermottlaw.com
rdizengoff@mcdermottlaw.com

*Counsel to CMG Funding 2025 LLC*