**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>CRISTÓBAL M. GALINDO, P.C. D/B/A GALINDO LAW FIRM,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 26-90764 (ARP) |
| CMG FUNDING 2025 LLC<br><br>Plaintiff,<br><br>v.<br><br>CRISTÓBAL M. GALINDO, P.C. D/B/A GALINDO LAW FIRM and GALINDO & MOTT, LLP,<br><br>Defendant | Adv. Pro. 26-03633 |

**DECLARATION OF JUSTIN BRASS IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER TEMPORARILY RESTRAINING AND PRELIMINARILY ENJOINING THE DEBTOR FROM USING CASH COLLATERAL ABSENT (I) CMG'S EXPRESS WRITTEN CONSENT OR (II) COURT-APPROVED ADEQUATE PROTECTION FOR CMG'S INTERESTS**

I, Justin Brass, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declare as follows:

1. I am over the age of 18 and competent to make this Declaration (as defined herein), which is made based on my personal knowledge of the facts and documents discussed herein.

2. I am the Co-CEO and Senior Managing Director of JBSL Legal Finance ("JBSL").

3. I am not being specifically compensated for this testimony.

[1] The Debtor's address is 18000 Groeschke Road, Suite A-7, Houston, Texas 77084, and the last four digits of the Debtor's federal tax identification number is 5859.

4. I submit this declaration (the "Declaration") in support of the relief requested in the *Motion for Entry of an Order Temporarily Restraining and Preliminarily Enjoining the Debtor from Using Cash Collateral Absent (I) CMG's Express Written Consent or (II) Court-Approved Adequate Protection for CMG's Interests* (the "Motion").[2]

5. CMG Funding 2025 LLC ("CMG") is a special purpose vehicle specifically formed to be the lender under the Credit Agreement (as defined herein) to the Debtor and Galindo & Mott LLP ("GM LLP" and together with the Debtor, the "Borrowers"). CMG is ultimately managed (through another limited liability company) by Ayal Glezer. Mr. Glezer is also the Chief Executive Officer of Deer Finance LLC ("Deer"), the servicer for the loan. Deer is the leading servicing and syndication platform for law firm loans.

6. JBSL was an arranger for, and is an investor in, the loan. The team at JBSL has been structuring and syndicating loans to law firms for the past nine years (including on their prior platform at the investment bank Stifel). I co-founded JBSL.

7. In early 2024, a commercial lending broker engaged by the Debtor (the "Broker") contacted me and inquired whether JBSL would be interested in arranging financing for the Borrowers, which the Broker explained was a plaintiff-side law firm looking to raise capital to expand its practice.

8. The Debtor and JBSL engaged in an arms-length negotiation regarding the financing opportunity and on May 9, 2024, the Debtor and GM LLP borrowed $25,000,000 under a senior secured credit agreement with CMG Funding 2024 LLC as lender and administrative agent, Deer as servicer, and JBSL as arranger (the "2024 Loan").

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

9. Less than a year later, in February 2025, the Debtor and JBSL again engaged in an arms-length negotiation regarding entry into a new credit facility and, on February 26, 2025, the Debtor and GM LLP entered into a credit agreement with CMG (the "Credit Agreement") in respect of a senior secured term loan totaling $45 million, which ultimately refinanced the original 2024 Loan and provided the Debtor with additional liquidity. As of the date hereof, approximately $50 million is outstanding under the Credit Agreement, including interest and fees.

10. CMG extended credit to the Debtor under the Credit Agreement and related documents including, without limitation, the following (collectively, the "Loan Documents"):

a. *Credit Agreement* dated February 26, 2025;

b. *Note* dated February 26, 2025;

c. *Security Agreement* dated February 26, 2025;

d. *Blocked Account Control Agreement* dated as of April 18, 2025; and

e. UCC-1 financing statements filed with the Texas Secretary of State.

11. Each of the above documents is attached to the Adversary Complaint and the Motion, and are true and correct copies of the documents that the Borrowers and CMG executed.

12. The Credit Agreement was not the first secured credit facility that the Debtor, GM LLP, and Mr. Galindo had entered into.

13. Mr. Galindo signed the Credit Agreement as the principal for each Borrower, including the Debtor.

14. In connection with the Credit Agreement, the Debtor executed a security agreement with CMG, also dated February 26, 2025 (the "Security Agreement"). Like with the Credit Agreement, Mr. Galindo personally signed the Security Agreement as the principal for each Borrower, including the Debtor.

15. On February 27, 2025, CMG perfected its security interest in the Debtor's and GM LLP's assets through the public filing of a UCC-1 financing statement with the Texas Secretary of State (the "CMG Financing Statement").

16. Upon filing the CMG Financing Statement, the Texas Secretary of State acknowledged that it indexed in its records the security interest listing each of the Debtor and GM LLP as a debtor and CMG as the secured party.

17. On April 18, 2025, CMG, the Debtor, and JPMorgan Chase Bank, N.A. executed that certain *Blocked Account Control Agreement – Secured Party Control* pursuant to which CMG was granted control over the account identified in the *Debtor's Emergency Motion for Entry of an Order (i) Authorizing the Debtor to Continue to Operate its Cash Management System and Maintain Existing Bank Accounts; and (ii) Granting Related Relief* as the "Collections Account" within the meaning of Section 9-104 of the UCC (the "BACA").

18. On February 26, 2025, Mr. Galindo executed that certain *Closing Date Certificate*, delivered pursuant to the Credit Agreement, including the certifications, representations, and acknowledgments therein.

19. Subsequent to the making of the loans under the Credit Agreement, CMG would receive quarterly reports prepared by the Debtor that provided CMG with an updated borrowing base of the cases that make up the collateral for the loan under the Credit Agreement (the "Collateral Reports"). In addition, in the months leading up to the Chapter 11 Case, the Debtor also provided CMG with an updated form of the Collateral Reports entitled "Collateral Weekly – Monthly – Quarterly Projections" which showed the expected revenue that formed the basis of the collateral and the projected dates of collection.

20. I am not aware of the Debtor or any other party previously disputing CMG's secured status prior to the Petition Date.

21. My understanding is Decibel Legal Services LLC ("Decibel") is owned and operated by Sergio de la Canal. I understand that pursuant to several master service agreements between the Debtor and Decibel, Decibel provides certain marketing services to the Debtor, including identifying potential clients for the Debtor and providing pre-screening, intake, and administrative services. I understand that through his company Damage Resources, LLC, Mr. de la Canal provides the Debtor with certain professional employer services, including handling the Debtor's payroll, bookkeeping and human resources-related needs, and is the co-employer of the Debtor's employees.

22. Prior to execution of the Credit Agreement, the Borrowers, Mr. Galindo, Decibel and Mr. de la Canal engaged with JBSL in negotiations and diligence relating to the Credit Agreement to help facilitate a potential merger involving the Debtor and one or more entities controlled by Mr. de la Canal. During these negotiations, Mr. de la Canal, Mr. Galindo, the Borrowers, and JBSL discussed adding Decibel and/or another entity affiliated with Mr. de la Canal as a co-borrower under the Credit Agreement, but ultimately determined against it.

23. Mr. de la Canal is specifically named in the Credit Agreement as a potential "Key Person" and "Limited Guarantor" contingent upon consummation of the contemplated merger involving the Galindo Parties, Decibel, and a law firm owned by Mr. de la Canal named LevelUp Law, LLC ("LevelUp").

24. Upon completion of the contemplated merger, Mr. de la Canal would have become a "Key Person" and a "Limited Guarantor" under the Credit Agreement.[3]

[3] A "key person" is an individual whose continued involvement with the borrower or its business is considered sufficiently important to the lender that the person's death, disability, or departure can trigger certain protections.

25. The contemplated merger never occurred.

26. In May 2025, Mr. de la Canal and Mr. Galindo, on behalf of the Debtor, met in person with JBSL. At that meeting, Mr. de la Canal asserted that the Debtor owed Decibel over $10 million on account of the services noted above and proposed that, in satisfaction of that alleged debt, either: (1) CMG could pay Decibel $5 million immediately and advance $10 million in secured funding to Mr. de la Canal's law firm, LevelUp; or (2) CMG could pay off the Debtor's alleged debt to Decibel in its entirety.

27. Mr. de la Canal gave CMG five days to respond, and threatened that if CMG declined his proposal, he would "have no alternative but to withdraw cases" from the Debtor's "case portfolio" and "reassign" them to a separate law firm over whose assets CMG would not have a lien.

28. I am not aware of any mechanism under any agreement between the Debtor and Decibel or any other Mr. de la Canal-affiliated entity pursuant to which Mr. de la Canal or an entity affiliated with him could unilaterally void the Debtor's various contractual arrangements directly with clients or other law firms.

29. CMG continued to engage with the Debtor and Mr. de la Canal and, in August 2025, Decibel and the Debtor revived the proposed merger contemplated by the Credit Agreement and circulated a proposal in writing to CMG. The proposal would form a new Texas limited liability company that would be co-owned, half by the Debtor and half by Mr. de la Canal (through another holding company), and required CMG to impair its rights under the Loan Documents and to advance additional funds to pay off the Debtor's alleged $10 million debt to Decibel.

30. On August 10, 2025, CMG responded by emailing Mr. de la Canal and the Debtor with an edited draft of their written proposal, which again explicitly referenced the Credit

Agreement and its requirement that the Debtor "have no other secured debt" apart from CMG's secured debt.

31. After some additional discussions, in October 2025, CMG declined the proposal.

32. I understand that in late 2024, Decibel, LLC sued the Debtor and Krause & Kinsman Group, LLP ("Krause & Kinsman"), a Referral Firm that the Debtor contracted with to pursue certain cases involving Zantac-related injuries, in Harris County District Court for the alleged $10 million debt owed to Decibel, LLC under one of its service agreements with the Debtor. Decibel, LLC never served the Debtor. In August 2025, the parties, including the Debtor, agreed to arbitrate their claims, although the proceeding did not advance until October 2025 – after CMG rejected the revised merger proposal. No notice of this proceeding was ever provided to CMG.

33. At the ad hoc private arbitration, Debtor put forward no defense resulting in a $10 million award against only the Debtor, despite that fact the initial case and arbitration were also brought against Krause & Kinsman.

34. On December 1, 2025, Decibel, LLC obtained a final judgment from the Harris County District Court confirming the $10 million arbitration award. Again, no notice of the awards was ever provided to CMG.

35. Nowhere in the public filings with the Harris County District Court did Decibel, LLC disclose either (a) the existence of the CMG secured loan and validly perfected lien on the Debtor's assets or (b) that it had in fact terminated and dissolved months before.

36. On March 6, 2026, Decibel, LLC filed an application for writ of garnishment seeking to garnish payments owed from Krause & Kinsman to the Debtor pursuant to a Referral Firm contract. I am not aware of any evidence that Decibel, LLC disclosed CMG's first-priority,

perfected security interest during the garnishment proceedings and no notice of any of these events was provided to CMG.

37. On March 23, 2026, after Krause & Kinsman voluntarily submitted to the District Court's jurisdiction, the District Court granted Decibel, LLC's garnishment motion, and entered a final judgment in garnishment ordering Krause & Kinsman to transfer funds owed to Debtor to Decibel, LLC (the "Garnishment Order").

38. Based upon information and my understanding, Krause & Kinsman and Decibel, LLC then "complied" with the Garnishment Order by transferring to Decibel, LLC funds that were not owed to the judgment debtor named in the Garnishment Order (the Debtor), but rather funds owed to GM LLP, over which CMG holds a first-priority security interest under the Credit Agreement.

39. CMG was and remains willing to discuss potential modifications to the terms of the CMG loans, but only on the condition that Mr. de la Canal and/or Decibel, LLC turn over to CMG the collateral that was improperly paid to Decibel, LLC purportedly pursuant to the Garnishment Order.

40. The Debtor has not sought CMG's consent to use its Cash Collateral.

41. But for the recently filed Cash Collateral Motion, the Debtor has not offered adequate protection to CMG for the use of Cash Collateral.

42. CMG has not consented to the Debtor's use of Cash Collateral.

43. I'm not aware of other creditors holding a lien senior to CMG's lien in the Debtor's cash.

44. CMG will suffer immediate and irreparable harm if the Debtor is authorized to use Cash Collateral without adequate protection or CMG's consent, because the Debtor's proposed

use reduces the Collateral pool securing CMG's claim and impairs CMG's ability to be repaid by the Debtor.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

August 26, 2026

*<u>/s/ Justin Brass</u>*
Justin Brass